UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMISI JERMAINE CALLOWAY,<br><br>        Plaintiff,<br><br>    v.<br><br>G. KELLEY, et al.,<br><br>        Defendants. | Case No.: 1:11-cv-01090-LJO-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>[ECF Nos. 87, 93] |

Plaintiff Jamisi Jermaine Calloway is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

## I.

## BACKGROUND

This action is proceeding on Plaintiff's claim of retaliation against Defendants Bostanjian, Trinh, Mazuk, Kelley, Wang, Schomer, Fritz, Talisman and Syed.

On February 17, 2015, Defendants filed a motion for summary judgment.  (ECF No. 87.) Plaintiff filed an opposition to Defendants' motion on May 4, 2015.  (ECF Nos. 99, 100, 101, 102.) Defendants filed a reply and objections to Plaintiff's opposition on May 12, 2015.  (ECF Nos. 105, 106.)

On March 30, 2015, Plaintiff filed a cross-motion for summary judgment.  (ECF No. 93.) Defendants filed an opposition to Plaintiff's motion on April 21, 2015.  (ECF No. 96.)  On May 13,

2015, Plaintiff filed a memorandum of points and authorities, statement of undisputed and disputed facts, and declaration in support of opposition to Defendants' motion for summary judgment.  (ECF Nos. 107, 109, 110.)  Plaintiff also filed a request for judicial notice.  (ECF No. 108.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence.  Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011).  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de

Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**DISCUSSION**

**A.     Evidentiary Objections**

On May 12, 2015, Defendants filed objections to evidence submitted in opposition to Defendants' motion for summary judgment. (ECF No. 106.) Defendants object to Exhibits 4 and 7, and the statements of inmates Volpe, Deloach, Glover, Leach, Jones, Saune, Deadmon, Archuleta, and Daniel.

**1.     Exhibit 4**

Defendants object to Exhibit 4, on grounds that this document is unsworn, in violation of 28 U.S.C. section 1746, and constitutes inadmissible hearsay, under Federal Rule of Evidence 802. In addition, the information in this document does not refer to Plaintiff's medical condition or treatment, and is not relevant under Federal Rule of Evidence 401.

Exhibit 4 is a newspaper article dated January 21, 2009, entitled "Transfer sought of 7.000 sick inmates." (Opp'n, Exhibit 4, ECF No. 102.) Defendants object on the grounds of hearsay and relevance. Defendants' objections are SUSTAINED. The information in this document is hearsay and does not refer to Plaintiff's medical condition or treatment and is thus not relevant. Fed. R. Evid. 401 & 802.

**2.     Exhibit 7**

Defendants object to Plaintiff's Exhibit 7, on grounds that the author is a Transplant Social Worker, with no demonstrable psychological or psychiatric training, and so lacks foundation to submit

an expert opinion as to Plaintiff's psychological condition, under Federal Rule of Evidence 702.  The conclusion reached by the document concerning a lack of psychosocial contraindications precluding a renal transplant is not relevant to any issues in this case and so is not admissible under Federal Rule of Evidence 401.

Defendants' objection as to relevance is SUSTAINED.  The conclusion reached in the document relating to psychosocial contraindications precluding a renal transplant is not relevant to the issues in this action.  Fed. R. Evid. 401.

    3.    Statements of Inmates

Defendants object to the statement of inmates Volpe, Deloach, Glover, Leach, and Jones, contained in Exhibit 40, on grounds that their conduct in signing an Against Medical Advise form terminating kidney dialysis is not relevant to the issues in this case, under Federal Rule of Evidence 401, since these inmates do not explain whether their Central Files contain reports of self-destructive behavior similar to those contained in Calloway's Central File.

Defendants further object to the statements of inmates Saune, Deadmon, Archuleta, and Daniel, contained in Exhibit 40, on grounds that the events of May 10, 2013, referred to by each inmate, occurred over a year after the Order for Involuntary Medication concerning Calloway terminated, so that these statements are no relevant to the issues in this case, under Federal Rule of Evidence 401.

Defendants' objections are SUSTAINED.  The statements of inmates Volpe, Deloach, Glover, Leach and Jones, set forth in Exhibit 40, that they signed an Against Medical Advice form terminating kidney dialysis is not relevant to the issues in this action, as there is no evidence that their central riles contains reports of self-destructive behavior similar to those contained in Plaintiff's central file.  Fed. R. Evid. 401.  The statements of inmates Saune, Deadmon, Archuleta, and Daniel, set forth in Exhibit 40, relate to events of May 10, 2013-which took place over a year after the Order of Involuntary Medication concerning Plaintiff terminated, and such statements are not relevant to this issues in the instant action.  Fed. R. Evid. 401.

///

///

4

**B.       Summary of Plaintiff's Complaint**

At the time of the incidents alleged in the complaint, Plaintiff was receiving treatment at the California Substance Abuse Treatment Facility, and then housed at Kern Valley State Prison.  Plaintiff alleges that on November 9, 2009, he arrived for his scheduled hemodialysis treatment and was placed on the machine by the nurse.  Plaintiff requested to speak to a custody sergeant because he felt he was being harassed by a correctional officer.  When the nurse stated that he was not involved in custody issues, Plaintiff requested to be taken off the machine and signed the form that he was terminating his treatment.  (First Am. Compl. 4, ECF No. 10.)

The custody sergeant arrived and Plaintiff explained the problem and asked to have his treatment continued without being subjected to mental abuse.  (Id.)  The nurse refused to continue the treatment and Plaintiff was taken back to his assigned cell.  The doctor called the nurse and "demanded" that Plaintiff's hemodialysis treatment be continued on November 9 or 10.  However, the nurse indicated that because there were no open chairs, they were not able to accommodate Plaintiff and he would need to be taken to an outside hospital to receive treatment.  Dr. Jeffrey Wang refused to send Plaintiff to an outside hospital for dialysis.  (Id. at 5.)

The following day, November 10, 2009, Plaintiff was escorted to the emergency room to see Defendant G. Kelley for a mental health evaluation.  (Id.)  Plaintiff claims that this was deliberate retaliation because he was brought to the emergency room under false pretenses.  After speaking with Defendant Kelley, Plaintiff was placed in a holding cell.  Defendant Kelley returned a few minutes later and informed Plaintiff that he was being admitted to a crisis bed for evaluation and Plaintiff became outraged.  Plaintiff alleges that he was sent for psychiatrist evaluation without a referral from his housing unit physician or any housing unit staff and a charge was fabricated that he refused hemodialysis on November 10, when the last day he had treatment was on November 9.  (Id. at 6.)  Plaintiff refused to go to the crisis unit and, after he calmed down, he was forcibly medicated, cuffed and taken to the crisis unit for evaluation.  Plaintiff alleges that this was retaliation by Defendants Kelley and Flavin.  (Id. at 7.)  Plaintiff claims that in retaliation for his complaints against the prison health care system, Defendant Marc Talisman fabricated a report to the administrative law judge

///

5

stating that Plaintiff had a mood disorder when there was no such evidence in the medical records prior to November 10, 2009.  (Id. at 8.)

Plaintiff contends that Defendants Wang and Melissa Fritz falsely reported that he refused hemodialysis, pulled his needles out, and shot blood at people.  (Id. at 8, 9-10.)  Due to the report of Defendant Talisman stating that Plaintiff was gravely disabled and incompetent, the administrative court ordered that Plaintiff be forcibly medicated.  (Id. at 8.)  Plaintiff alleges that Defendants V. Schomer, Peter Mazuk, C. Trinh, M. Bostanjian, and M. D. Syed all deliberately filed false documents with the administrative court claiming that without being forcibly medicated he would seriously decompensate and his thinking would become impaired to the point that he would be a harm to himself and others.  Plaintiff claims these false reports were submitted to prevent him from pursing his legal claims against the prison system for deliberate indifference to his medical needs and inadequate housing due to the failed healthcare system and overcrowding.  (Id. at 11.)

On February 7, 2012, Plaintiff states that the Keyhea order was dismissed at the request of the State after he proved that their reports were fabricated.[1]  (Id.)  Plaintiff claims that he has not been forcibly medicated since February 7, 2012, and it is clear that he was never gravely disabled or incompetent to refuse medication.  (Id. at 12.)

### C.   Parties Statement of Undisputed Facts

1.   Plaintiff's Proposed Statement of Undisputed Facts in Support of Motion for Summary Judgment

In support of his motion for summary judgment, Plaintiff submits the following proposed undisputed facts:

1.   The alleged events occurred while plaintiff was incarcerated at CSP #1 Corcoran, CSATF CSP #1 Corcoran and KVSP CDCR Correctional facilities during 2007 and 2012.

2.   Defendants G. Kelley, Marc Talisman, Jeffrey Wang, Melissa Fritz, V. Schemer, Peter Mazuk, C. Trinh, M. Bostanjian and Syed was employed at one point at Corcoran State Prison #1

---

[1] The record reflects that the order to involuntarily medicate Plaintiff was terminated because the doctor could not attend the Keyhea hearing.  (ECF No. 10-1 at 177.)

[CSP #1], California Substance Abuse Treatment Facility Corcoran State Prison #II [CSATF CSP #II], and Kern Valley State Prison [KVSP] California Department of Corrections and Rehabilitation [CDCR] Facilities through 2007-2012.

      3.      On November 9, 2009, Plaintiff was not diagnosed of having any mood swing disorder or being biapolar [sic] prior to being Keyhea on November 10, 2009.

      4.      On November 9, 2009, Plaintiff was with in his patient rights under Davita Inc. Healthcare to terminate his hemo dialysis treatment early after he believed he was being harassed and retaliated against.

      5.      Plaintiff never received from any hemo dialysis life sustaining treatment on November 10, 2009 nor did he pull out his needles and deliberately try to spray dialysis staff with his blood as reported on November 10, 2009 in which caused him to be removed from his assigned housing after a medical appeal hearing for the group appeal of retaliatory reprisals, deliberate indifference to serious medical needs, cruel & unusual punishment of staff misconduct.

      6.      Plaintiff made numerous medical complaints concerning retaliation, deliberate indifference to serious medical needs, and cruel & unusual punishment from 2007 to November 10, 2014 before he was retaliated against and Keyhea for filing grievances and exercising his constitutional rights.

      7.      Plaintiff never threaten to rape any nurse or tec [sic] at Davita Inc., or Queens Dialysis and that RVR 1-15 was a feberecated [sic] report by custody and Queens Dialysis out of retaliatory reprisal.

      8.      Plaintiff was never gravely disable or incompetent prior to November 10, 2009 to refuse psychotropic [sic] involuntary force medication nor was it any imminent danger to plaintiff life after being evaluated by doctors on November 9, 2009 and November 10, 2009.

      9.      Plaintiff did not meet the CDCR criteria to be housed in the mental health crisis bed after terminating his dialysis early the day before on November 9, 2009 and there was never an imminent threat to his life that day on November 10, 2009 when he never had dialysis, and had plaintiff Keyhea reports was not deliberately fabricated [sic] then plaintiff would not had been Keyhea on November 10, 2009 or admitted into the mental health crisis bed unit.

10.     Plaintiff after being Keyhea suffered [sic] from chest pain, low blood pressure, uncontrollable shakes and grinding his teeth, denied kidney transplant which caused him to mentally and physically to decline.

11.     Plaintiff was never evaluated by the defendants prior to Keyhea or after because he was never sent out to be evaluated at a mental health facility or an out patient E.O.P. level of care in order to cover up the true facts that plaintiff was not gravely disable or gravely incompetent to refuse phychotropic [sic] involuntary force medication.

12.     It was a clear violation of plaintiff's constitutional rights to Keyhea plaintiff in retaliation after he made it clear to the defendants about his problems at CSP #1 and CSATF CSP #II which the defendants stuck their head in the sand and choose to retaliate instead of fixing the problem and address the inadequate medical problems throughout the state.

13.     Plaintiff was competent and there was no evidence to support that plaintiff was gravely disable or incompetent to refuse involuntary phychotropic force medication on December 16, 2009 Keyhea hearing and there is no Keyhea hearing records of the transcript of [Case No. 2009120151].

14.     Plaintiff is not gravely disable or incompetent and have not suffered [sic] death as reported he would if a Keyea [sic] order was not issued or continued, which was fabericated [sic] only to incompassate [sic] plaintiff and retaliate against him for exercising his constitutional rights to grieve the abuse he received at the hands of his care givers CSP #1 and CSATF CSP #II.

2.     <u>Defendants' Proposed Statement of Undisputed Facts in Support of Motion for Summary Judgment[2]</u>

In support of their motion, Defendants submit the following statement of undisputed facts:

1.     Plaintiff Calloway arrived at the California Substance Abuse Treatment Facility (SATF) six-bed dialysis facility for kidney dialysis on November 9, 2009.  (First Amended Complaint (FAC), ECF No. 10, at 4.)

---

[2] Because Plaintiff objects to all of Defendants' proposed statements of undisputed facts numbered 1 through 94, except numbers 1, 2, 19, 20, 50, 68, 69, 71, 78, 83, 90, 91, 92 and 93, the Court finds the prudent approach is to resolve the disputed and undisputed facts in the analysis portion of the instant recommendation, rather than address each and every dispute individually.

2.      Because of alleged harassment by Correctional Officer Luna, Calloway terminated his kidney analysis and signed an Against Medical Advice (AMA) form.  (FAC, at 4.)

3.      Before signing the ADA form, Calloway was advised of the consequences of cutting his hemodialysis treatment short, and stated, words to the effect, that he did not care.  (FAC, at 102.)

4.      On April 25, 2009, Calloway had stated to a Dialysis Technician, D. Haws, "If I don't win my appeal, I'm going to kill a C/O so they kill me.  I'm not going to stay in prison for the rest of my life for something I did not do."  (Rules Violation Report (RVR) Log. No. 4A4-09-05-06, Exhibit A.)

5.      On May 14, 2009, while receiving kidney dialysis, Correctional Staff at Corcoran reported that Calloway had administered approximately 700 cc of normal saline from a 1000 cc intravenous bag, hanging on a dialysis machine pole, leaving the bag empty.  (RVR, Log. No. 4A4-09-05-27, Exhibit B.)

6.      Injecting this amount of fluid into the intravenous lines in such a brief period of time posed a risk of cardiac failure and pulmonary edema.  Additionally, running a saline bag empty during kidney dialysis can cause an air pocket to form in the intravenous lines, which could result in an air embolism and death for the patient.  Once there is air in the lines, the dialysis machine will not allow the blood from the patient to be returned to the body, which can lead a serious loss of blood for the patient.  (Fritz Decl., Exhibit C at 2:10-22.)

7.      On July 18, 2009, a Patient Care Technician from DaVita Renal Services, L. Koetzner, reported that, while receiving kidney dialysis treatment at SATF, Calloway had removed a venous needled from his body and proceeded to spray blood around the room.  (FAC, ECF No. 10-1, at 91.)

8.      Correctional Sgt. J. Davidson reported that, on September 10, 2009, Calloway was so disruptive at the John D. Clarich Memorial Hospital, demanding when and how to be seen by medical staff, that medical staff refused to examine or treat him.  (RVR, Log No. HCO-09-09-03, Exhibit D.)

9.      On October 23, 2009, while receiving kidney dialysis, Calloway stated to a HemoDialysis  Technician in the nineteen-bed dialysis facility operated by DaVita Dialysis Centers," if shit was to pop off in here, there is only four cops.  Your asses would get raped."  Calloway went on

9

to state, "The cops would kill one of you before they would let an inmate escape." (RVR, Log No. 4A2-09-10-93, Exhibit E.)

10.     On November 2, 2009, Yaseen Bari, the Administrator of the nineteen-bed dialysis station operated by DaVita Dialysis Centers, wrote a memorandum stating that, due to Calloway's threats of violence, and foul and vulgar language, he should be removed from the nineteen-bed dialysis station, because the staff did not feel safe in treating Calloway. (FAC, ECF No. 10-1, at 92.)

11.     After receiving this memorandum, Defendant Fritz made arrangements for Calloway to receive dialysis treatment at the six-bed dialysis facility at SATF, three times per week. (Fritz Decl., Exhibit C, at 3:15-16.)

12.     On November 9, 2009, after Calloway denied to resume his dialysis treatment, there was no space available to continue his treatment at the six-bed dialysis facility, as other inmate-patients were scheduled for dialysis in the same station. (Fritz Decl., Exhibit C at 4:1-7.)

13.     On November 9, 2009, Defendant Fritz explained to correctional staff that, if Calloway developed any symptoms, he should be transported to an outside hospital. (Fritz Decl., Exhibit C at 4:1-7.)

14.     On November 9, 2009, Defendant Fritz spoke with Defendant Wang, a Physician and Surgeon at California State Prison-Corcoran (Corcoran), explained that there were no open spots for Calloway to receive dialysis on either November 9, 2009, or November 10, 2009, and recommended that Calloway be sent to an outside hospital for dialysis, if necessary.

15.     Fritz also informed Dr. Wang that Calloway had received fifty minutes of dialysis on November 9, 2009. (Fritz Decl., Exhibit C, at 4:13-16, Wang Decl., Exhibit F at 2:4-6.)

16.     At the direction of Supervising Registered Nurse P. Vryhoff, Fritz sent her chart note concerning the incident of November 9, 2009, to S. Bylund, Ph.D., Chief, Mental Health Services, at Corcoran, who indicated that he would set up a meeting with his staff to discuss Calloway's case. (Fritz Decl., Exhibit C at 4:17-21.)

17.     Fritz did not forward any false information to DR. Bylund. (Fritz Decl., Exhibit C at 5:3-4.)

10

18.     Fritz forwarded information concerning Calloway to Dr. Bylund at his request, in the hope that the mental health staff at Corcoran would be able to adequately treat Mr. Calloway's mental issues, including his self-destructive behavior.  (Fritz Decl., Exhibit C at 5:1-4.)

19.     Defendant Wang, a Physician and Surgeon, encountered Calloway on November 9, 2009, and was informed that Calloway had refused dialysis after being harassed.  (Wang Decl., Exhibit F at 2:1-3.)

20.     Dr. Wang examined Calloway, found not significant abnormalities, attempted to educate Calloway on the importance of being compliant with his hemodialysis treatment, and informed Calloway to return to the Emergency Room if Calloway developed any significant symptoms.  (Wang Decl., Exhibit F at 2:10-14.)

21.     Dr. Wang next encountered Calloway on November 10, 2009, for the purpose of physically examining Calloway in connection with the admission of Calloway to the John D. Klarich Memorial Hospital at Corcoran, which had been recommended by mental health staff.

22.     Dr. Wang was unable to complete a physical examination of Calloway at that time, because Calloway was in a holding cell, alert but agitated, shouting out threats, and would not allow his vital signs to be check.  (Wang Decl., Exhibit F at 2:18-20.)

23.     Dr. Wang was unable to obtain a medical history from Calloway because of Calloway's agitated mental state, and Calloway's Unit Health Record (UHR) was unavailable at that time.  (Wang Decl., Exhibit F at 2:21-23.)

24.     Dr. Wang was informed by mental health staff that Calloway had interrupted his dialysis, had pulled out a catheter, and smeared his blood towards nursing and custody staff.  (Wang Decl., Exhibit F at 2:21-24.)

25.     Based on the information provided by mental health staff, along with the observations of agitated and threatening behavior by Mr. Calloway on November 10, 2009, and the information provided to Dr. Wang by Calloway on November 9, 2009, concerning harassment by hemodialysis staff, it was Dr. Wang's medical opinion that Calloway was suffering from paranoid ideation, threatening behavior, agitation, and end-state renal disease.  Whether Calloway had gone to dialysis on

November 10, 2009, or had interrupted his treatment on that date, was not a significant factor in making this diagnosis.  (Wang Decl., Exhibit F at 2:25-3:3.)

26.     Dr. Wang deferred further mental health treatment, including the administration of psychotropic medication, to the mental health team at Corcoran, but did recommend that Calloway's potassium levels be monitored, that his maintenance medications be maintained, and that Calloway resume dialysis once he became cooperative.  (Wang Decl., Exhibit F at 3:4-8.)

27.     As of November 10, 2009, Dr. Wang was unaware of any complaints submitted by Calloway.  (Wang Decl., Exhibit F at 3:9-11.)

28.     Dr. Wang's diagnosis and treatment plan for Calloway were based on his medical judgment and were not intended to retaliate against Calloway.  (Wang Decl., Exhibit F at 3:9-11.)

29.     Defendant Kelley, a psychologist, encountered Calloway on November 10, 2009, at Corcoran, in order to conduct a Mental Health Evaluation, after Calloway was referred to Kelley by M. Flavan, M.D., a psychiatrist, for refusing kidney dialysis treatment.  (Kelley Decl., Exhibit G at 2:1-5.)

30.     Prior to November 10, 2009, Dr. Kelley was unaware of any complaints submitted by Calloway concerning his incarceration, or the medical care, dialysis treatment, or mental health care Calloway was receiving.  (Kelley Dec., Exhibit G at 1:26-27.)

31.     At that time, Dr. Kelley understood that Dr. Flavan intended to admit Mr. Calloway to a Mental Health Crisis Bed for further treatment.  (Kelley Decl., Exhibit G at 2:1-5.)

32.     Dr. Kelley reviewed Dr. Flavan's notes which indicated that Calloway had stated that he would not take medications voluntarily.  (Kelley Decl., Exhibit G, at 2:1-5; Progress Note, Exhibit H.)

33.     Dr. Kelley attempted to interview Calloway on November 10, 2009, at approximately 1:52 p.m., when Calloway spoke in a loud voice, and appeared to be agitated.  Calloway accused the police, medical, and mental health personnel of misconduct, and appeared to be paranoid about correctional officers and a registered nurse.  Calloway described an incident at dialysis, when he was told by staff to take off a blanket, and subsequently was taken off dialysis.  Calloway stated "I'm not going over there anymore," which Kelley interpreted as an intention not to obtain further dialysis

1   treatment.  During this interview, Calloway's agitation and the loudness of his voice increased, and

2   Calloway became threatening.  Calloway informed Dr. Kelley of a history of head trauma, when

3   Calloway sustained a gunshot wound to the back of his head and his cheek.  Calloway also informed

4   Kelley of prior drug use involving alcohol and marijuana.  (Kelley Decl., Exhibit G at 2:6-17.)

5         34.    Based on the information provided by Calloway, Dr. Flavan and the available Unit

6   Health Records, Dr. Kelley made a diagnosis, utilizing the criteria contained in the Diagnostic and

7   Statistical Manuel of Mental Disorders (DSM) of Mood Disorder due to kidney disease, polysubstance

8   dependence, personality disorder, renal failure, and hypotension, with incarceration and medical

9   issues, and recommended a treatment plan to target Calloway's need for dialysis, extreme agitation,

10   paranoia, and threatening behavior.  (Kelley Decl., Exhibit G at 2:19-25.)

11         35.    Dr. Kelley also prepared a Suicide Risk Assessment Checklist, which noted that

12   Calloway did not have a current suicidal ideation, plan, or intent, but that he had a history of mental

13   illness, chronic kidney disease, history or poor impulse control or poor coping skills, was facing a long

14   prison sentence, and was agitated and angry, all of which are risk factors for suicide.  (Kelley Decl.,

15   Exhibit G at 2:26-3:2.)

16         36.    Kelley did not falsify any information contained in his reports, and his diagnosis and

17   treatment plan for Calloway was based solely on Kelley's professional judgment, and was not

18   intended to retaliate against Mr. Calloway for any complaints Calloway may have submitted.  (Kelley

19   Decl., Exhibit G at 3:3-5.)

20         37.    The treatment plan targets Dr. Kelley identified were intended to assist Calloway in

21   dealing with the stresses he faced, including correctional staff, medical staff, and mental health staff.

22   (Kelley Decl., Exhibit G at 3:5-7.)

23         38.    Dr. Talisman encountered Calloway in a holding cell in the emergency room at the

24   John D. Klarich Memorial Hospital at Corcoran on November 10, 2009, after Dr. Flavan, a

25   psychiatrist, had recommended that Calloway be admitted to a Mental Health Crisis Bed for treatment

26   because Calloway had refused dialysis treatment and had indicated that he would not take medication

27   voluntarily, and had become agitated and paranoid, and after Dr. Kelley, a psychologist, had made a

28   diagnosis of Mood Disorder due to kidney disease, polysubstance dependence, personality disorder,

renal failure, and hypotension, with incarceration and medical issues, and had recommended a treatment plan to target Calloway's need for dialysis, extreme agitation, paranoia and threatening behavior.  (Talisman Decl., Exhibit M at 1:26-2:6.)

39.     Dr. Talisman attempted to interview Calloway on November 10, 2009, at which time Calloway was loud, frequently shouting, agitated and paranoid, sweating, motorically hyperactive, with his eyes darting from side to side, unable to tolerate questions or feedback from staff, and yell at Dr. Talisman, "I don't need to see you people."  Calloway was red-faced and sweating as a result of his agitation, and threatened harm to anyone who removed him from the holding cell.  Calloway denied any provocation on his part, and stated that he had been kicked out of dialysis because of retaliation by correctional officers due to his history of filing lawsuits for lack of medical care.  He also complained that he was not receiving the medication and dialysis treatment ordered by his physicians.  (Talisman Decl., Exhibit M at 2:7-17.)

40.     In Dr. Talisman's medical opinion, Calloway did not appear to be responding to internal stimuli, was tangential, demonstrated over-inclusive thinking, and paranoid thinking, with no insight, and impaired judgment.  (Talisman Decl., Exhibit M at 2:18-20.)

41.     Dr. Talisman was aware that Calloway was scheduled for a dialysis treatment on November 11, 2009, believed that Calloway needed to be pre-medicated in order to complete this procedure, and also was aware that Calloway was refusing to take any psychotropic medication, so Dr. Talisman ordered on November 10, 2009, that Calloway be administered Cogentin with Haldol, an anti-psychotic medication, and Ativan for anxiety, on an involuntary basis, so that Calloway could complete the dialysis treatment.  (Talisman Decl., Exhibit M at 2:21-26.)

42.     Calloway successfully completed the dialysis treatment on November 11, 2009.  (Talisman Decl., Exhibit M at 2:27-28.)

43.     After the administration of Haldol, Calloway appeared to be calmer, and Dr. Talisman was able to interview Calloway on November 12, 2009, at which time Calloway denied mental illness and blamed his problems on dialysis staff, who had caused him to submit one hundred seventeen 602 grievances.  Calloway claimed that he was being "set up," and that he was going to sue Dr. Talisman.  As Calloway was scheduled for dialysis treatment on November 13, 2009, Dr. Talisman ordered

14

Calloway to start on oral medications, Depakote, a mood stabilizing medication, and Risperdal, a tranquilizing medication, so that Calloway would successfully complete the dialysis treatment. (Talisman Decl., Exhibit M at 3:1-9.)

44.     Dr. Talisman reviewed Calloway's Central File and observed documentation referring to impulsive and self-destructive behavior on the part of Calloway, including an incident on April 25, 2009, when Mr. Calloway had stated to a Dialysis Technician, "If I don't win my appeal, I'm going to kill a C/O so they kill me.  I'm not going to stay in prison for the rest of my life for something I did not do," an incident on May 14, 2009, when Calloway, while receiving kidney dialysis, had administered 700 cc of normal saline from a 1000 cc intravenous bag, hanging on a dialysis machine pole, leaving the bag empty, which could have introduced air into his blood stream, killing him, an incident on July 18, 2009, while receiving kidney dialysis treatment at SATF, when Calloway had removed a venous needle from his body and proceeded to spray blood around the room, an incident on October 2, 2009, when Calloway was loud, cursing, disruptive, and thrashing about in his dialysis chair, and an incident on October 23, 2009, when Calloway stated to a technician that there were only four cops present that she would get raped.  Dr. Talisman also reviewed a memorandum demonstrating that, as of November 2, 2009, because of disruptive behavior, and threats to staff, Mr. Calloway was removed from the nineteen-chair dialysis station.  (Talisman Decl., Exhibit M at 3:10-26.)

45.     Dr. Talisman was concerned that Calloway's impulsive and self-destructive behavior had interfered with his dialysis treatment, which Calloway needed to survive, and that, unless Calloway was medicated, Calloway's behavior would continue to be out of control, would continue to interfere with his dialysis treatment, and that his mental and physical condition would deteriorate. (Talisman Decl., Exhibit M at 3:27-4:10.)

46.     Dr. Talisman also was concerned that, in light of Calloway's denial of mental illness, and any need for medication to treat his mental illness, Calloway was unable to appreciate the seriousness of his situation, was unwilling and unable to understand knowingly, and to act upon, information provided by his health care providers, and so did not have the capacity to provide an informed consent for psychotropic medication.  (Talisman Decl., Exhibit M at 4:4-10.)

47.     Knowing that Calloway had successfully completed dialysis treatment after the commencement of involuntary medication, Dr. Talisman presented information concerning Calloway's case to the Keyhea Certification Officer at Corcoran, who determined that there was sufficient grounds to proceed with filing of a Petition for Judicial Determination Re: Involuntary Medication.  (Talisman Dec., Exhibit M at 4:8-13.)

48.     Dr. Talisman then prepared a report, dated November 24, 2009, and a Declaration, filed in connection with a Petition for Judicial Determination Re; Involuntary Medication, expressing the opinion that Calloway required psychotropic medication to be administered voluntarily because Calloway lacked capacity to provide an informed consent for psychotropic medication, and required the medication to address self-destructive and impulsive behavior which was interfering with Calloway's dialysis treatment.  (Talisman Decl., Exhibit M at 4:11-20.)

49.     Dr. Talisman recommended involuntary medication be administered to Calloway, before and after Calloway threatened to sue Talisman, solely to treat Calloway's mental health issue and not to retaliate against Calloway.  (Talisman Decl., Exhibit M at 4:21-5-2.)

50.     Calloway transferred to Kern Valley State Prison (KVSP) on July 30, 2010.  (FAC, Exhibit A.)

51.     On September 28, 2010, Defendant Schomer, a psychiatrist at KVSP, participated in an Out-Patient Interdisciplinary Treatment Team (IDTT) meeting concerning Calloway, along with Calloway's Case Manager, during which it was noted that Calloway was being treated with medication under a Keyhea medication order which was due to expire on December 16, 2010, that his mental condition was stable at that time, and that inmate Calloway was a kidney dialysis patient. (Schomer Decl., Exhibit I at 2:10-20.)

52.     As of September 10, 2010, the treatment plan for Calloway was to continue treating him with medication, to include inmate Calloway in the Mental Health Services Delivery System at the Correctional Clinical Case Management System, and to continue to evaluate whether it would be appropriate for inmate Calloway to participate in group therapy.  (Schomer Decl., Exhibit I, at 2:1-20.)

53.     Dr. Schomer encountered Calloway on October 25, 2010, for the purpose of conducting a medication evaluation and Keyhea renewal evaluation, at which time Calloway reported that he was

sleeping well, with good appetite, and denied any side effects from his current medications, which consisted of Depakote, Resperdal, Abilify, and Haldol.  Calloway was alert and oriented, and demonstrated average grooming during this encounter.  (Schomer Decl., Exhibit I at 2:21-25.)

54.     In discussing his case with Dr. Schomer, Calloway was distractible, demonstrated thought blocking, and appeared to exhibit delusions, in that he denied having any mental health problems and did not need any psychological medication, when the information in his chart included self-destructive behavior while undergoing kidney dialysis, such as self-administering fluids and disrupting the dialysis process.  (Schomer Decl., Exhibit I at 2:25-3:2.)

55.     In Dr. Schomer's medical opinion, Calloway did not understand or believe that his mental health condition had stabilized during the prior year because of the psychological medications which had been prescribed.  (Schomer Decl., Exhibit I at 3:2-4.)

56.     On October 25, 2010, based on her interview of Calloway, her review of his mental health records, and her professional medical judgment, Dr. Schomer diagnosed Calloway with a Mood Disorder with Psychotic Features, and recommended that Calloway continue to take Depakote for mania, mood swings, and agitation, and Risperdal for mania and delusions.  In the event that inmate Calloway refused these medications, Dr. Schomer recommended that administration of Haldol and Abilify.  She also recommended administering Vistaric before each kidney dialysis session for anxiety.  (Schomer Decl., Exhibit I at 3:5-12.)

57.     On November 23, 2010, Dr. Schomer signed a Declaration in Support of Verified Petition for Renewal Judicial Determination Re: Involuntary Medication, which was based on her review of documents contained in the files maintained by CDCR concerning Calloway, her interview of Calloway, and her own professional judgment, and which reiterated the history reported to her concerning Calloway's prior self-destructive behavior, the stabilization of his mental health condition over the prior year after the administration of medication prescribed for his mental health condition, Calloway's denial of any mental problems or the need for mental health medication, and Dr. Schomer's concerns that, if mental health medication was not administered, Calloway again would try to sabotage his medical treatment by failing to cooperate with medical personnel, engaging in self-destructive behavior, or both.  (Schomer Decl., Exhibit I at 3:13-24.)

58.     Prior to November 23, 2010, Dr. Schomer was unaware of any complaints Calloway had asserted against herself, against the health care professionals at Kern Valley State Prison, or against the health care professionals at any other correctional institution.  (Schomer Decl., Exhibit I at 3:25-27.)

59.     Dr. Schomer's recommendations and opinions concerning Calloway were motivated solely by a desire to treat his mental health issues, not to retaliate against Calloway for asserting any complaints.  (Schomer Decl., Exhibit I at 3:27-4:2.)

60.     Defendant Mazur, a psychiatrist, encountered Calloway on August 24, 2010, at which time Dr. Mazur reviewed his available mental health records, interviewed Mr. Calloway, and made an assessment of Calloway's condition, noting that, subjectively, Calloway was doing well, and recommending a treatment plan to continue with the mood-stabilizing medications previously prescribed, and to discontinue these medications once Mr. Calloway's condition had stabilized. (Mazur Decl., Exhibit J at 1:25-2:1.)

61.     Although Dr. Schomer was Calloway's primary clinician after August 24, 2010, Dr. Mazur was asked to testify in the Keyhea process involving Calloway on December 15, 2010.  (Mazur Decl., Exhibit J at 2:3-5.)

62.     In order to prepare for this hearing, Dr. Mazur reviewed Calloway's mental health and central files, along with a report prepared by Dr. Schomer, dated October 25, 2010, and interviewed Calloway on December 15, 2010, prior to the Keyhea proceeding.  (Mazur Decl., Exhibit J at 2:4-11.)

63.     In reviewing Calloway's files, Dr. Mazur observed reports that Calloway required dialysis for end-stage renal disease, that, in the past, his dialysis treatment had been terminated because Calloway was uncooperative, and that Mr. Calloway had informed staff that he wanted to die. (Mazur Decl., Exhibit J at 2:8-11.)

64.     As of December 15, 2010, Dr. Mazur was unaware of any complaints submitted by Calloway concerning custody staff at KVSP, or the medical or mental health treatment he was receiving at KVSP.  (Mazur Decl., Exhibit J at 2:12-14.)

65.     As of December 15, 2010, it was Dr. Mazur's professional medical opinion that Calloway was suffering from a Mood Disorder, Not Otherwise Specified, based on reported symptoms

of irritability, mood swings, anxiety, problems sleeping, depression, and impulsiveness, and that Calloway had poor insight into his mental health issues, as evidenced by his statements that he did not think he had any mental illness, and that he did not require medication to treat mental illness.  (Mazur Decl., Exhibit J at 2:15-22.)

66.     As of December 15, 2010, Dr. Mazur believed that, since Calloway had been taking psychotropic medication, his condition had significantly improved, but was concerned that if Calloway were not forced to take psychotropic medication, Calloway would probably stop taking this medication, because Calloway does not believe the medication was helping him.  Should Calloway stop taking the recommended medication, his mental condition likely would decompensate, which would make it more difficult to treat his end-stage renal disease.  (Mazur Decl., Exhibit J at 2:22-27.)

67.     Since Dr. Mazur was unaware of any complaints Calloway had asserted against himself, against the health care professional at Kern Valley State Prison, or against the health care professionals at any other correctional institution, Dr. Mazur's recommendations and opinions concerning Calloway were motivated solely by a desire to treat Calloway's mental health issues, not to retaliate against Calloway for asserting any complaints.  (Mazur Decl., Exhibit J at 3:1-6.)

68.     Defendant Bostanjian, a psychiatrist encountered Mr. Calloway on October 18, 2011, at his cell front, for the purpose of evaluating whether Mr. Calloway should continue to receive psychotropic medications involuntarily under a Keyhea Order.  (Bostanjian Decl., Exhibit K at 1:25-27.)

69.     Dr. Bostanjian observed that Calloway appeared to be angry and irritable.  Calloway maintained that he did not have any mental illness, that he did not need to receive medication on an involuntary basis under a Keyhea Order, that nothing would happen to him if he stopped taking psychotropic medications, and that the medications made him throw up, which was an unreliable statement, since Calloway had denied any mental illness or the need to take psychotropic medication, and it appeared that Calloway might be trying to manipulate staff into believing that he will take medications when he has no intention of doing so.  (Bostanjian Decl., Exhibit K at 1:27-2:6.)

70.     Dr. Bostanjian believed that Calloway was suffering from a Mood Disorder, Not Otherwise Stated, based on symptoms of anger and irritability, and felt that Calloway demonstrated

little insight into his mental illness or his need for psychotropic medication, so she recommended that Calloway continue to take Risperdal and Depakote for his mental illness.  (Bostanjian Decl., Exhibit K at 2:6-11.)

71.     Dr. Bostanjian encountered Calloway on November 11, 2011, when Calloway informed her that he had no complaints, that he had no mental illness, and that he did not need to take forced medication, describing his mood as "good," and stating that he was not taking the medication prescribed, as he did not swallow it.  (Bostanjian Decl., Exhibit K at 2:12-15.)

72.     Dr. Bostanjian believed that Calloway demonstrated a congruent mood, in that his memory process selectively retrieved memories and recollections which were consistent and congruent with his mood, and, because of the changes in Calloway's mood, compared with prior visits, Calloway was suffering from Bipolar Affective Disorder.  She recommended that Calloway continue to take Risperdal and Depakote for his mental illness.  (Bostanjian Decl., Exhibit K at 2:15-20.)

73.     After the encounter of November 11, 2011, Dr. Bostanjian reviewed Mr. Calloway's records, and prepared a Declaration for consideration in an upcoming legal proceeding to determine whether Calloway should continue to be forced to take psychotropic medication, reiterated the history reported to me concerning inmate Calloway's prior self-destructive behavior, which included an incident of April 25, 2009, when Mr. Calloway stated, to a Dialysis Technician, D. Hawn, "If I don't win my appeal, I'm going to kill a C/O so they kill me.  I'm not going to stay in prison for the rest of my life for something I did not do," an incident on May 14, 2009, when Calloway, while receiving kidney dialysis, had administered approximately 700 cc of normal saline from a 1000 cc intravenous bag, hanging on a dialysis machine pole, leaving the bag empty, which could have introduced air into his blood stream, killing him, an incident on September 10, 2009, when Calloway was so disruptive at the John D. Clarich Memorial Hospital, demanding when and how to be seen by medical staff, that medical staff refused to examine or treat him, and an incident on October 23, 2009, when, while receiving kidney dialysis, Calloway stated to a Hemo-Dialysis Technician in the nineteen-bed dialysis facility operated by DaVita Dialysis Centers, "if shit was to pop off in here, there is only four cops.

20

Your asses would get raped," and "the cops would kill one of you before they would let an inmate escape." (Bostanjian Decl., Exhibit K at 2:24-3:14.)

74.     As of November 16, 2011, in Dr. Bostanjian's professional medical opinion, if psychotropic medications were not administered, Calloway likely would revert to prior self-destructive behavior and would attempt to thwart medical staff in their efforts to keep him alive through dialysis treatment, and that, by either acting impulsively in a manner which prevent him from receiving medical treatment, or by refusing dialysis, Calloway was gravely disabled, and that the administration of involuntary medication was the most appropriate and least restrictive means of safeguarding Calloway's health and safety. (Bostanjian, Decl., Exhibit K at 3:15-22.)

75.     Due to a schedule conflict, which prevented Dr. Bostanjian from attending the scheduled hearing, Defendant Trinh, a psychiatrist, signed the Declaration prepared by DR. Bostanjian. (Bostanjian Decl., Exhibit K at 3:22-24; Trinh Decl., Exhibit L at 2:23-3:3.)

76.     Dr. Bostanjian attended the continued Keyhea hearing on February 7, 2012, along with Dr. Syed, during which it was discussed that having Calloway take psychotropic medication was interfering with his efforts to obtain a kidney transport, so the order for involuntary medication was terminated. (Bostanjian Decl., Exhibit K at 3:25-28; Syed Decl., Exhibit N, at 3:3-6.)

77.     Since Dr. Bostanjian was unaware of any complaints Calloway had asserted against herself, or the other health care professionals at Kern Valley State Prison, her recommendations and opinions were motivated by a desire to treat his mental health issues, not to retaliate against Calloway for asserting any complaints. (Bostanjian Decl., Exhibit K at 4:7-11.)

78.     Dr. Trinh, a psychiatrist at Kern Valley State Prison, was not involved in the preparation of the Petition for Involuntary Medication concerning Calloway filed in 2009, or the Petition for Renewal of Involuntary Medication filed in 2010. (Trinh Decl., Exhibit L at 1:26-2:7.)

79.     Dr. Trinh encountered Calloway on May 3, 2011, at Kern Valley State Prison, as his usual psychiatrist, Dr. Bostanjian, was not available, and conducted a standard psychiatric examination, which included obtaining a history of prior problems and treatment from the inmate, and learned that Calloway previously had been taking Depakote and Risperidone on an involuntary basis.

Calloway stated that, while he did not want to take this medication on involuntary basis, he was "doing ok" while taking this medication.  (Trinh Decl., Exhibit L at 2:12-22.)

80.    On May 3, 2011, Calloway denied any mental problems, his mood was hypomanic and he demonstrated paranoid delusions.  Based on Dr. Trinh's experience and medical judgment, he diagnosed inmate Calloway with bipolar disorder, with psychotic features, and recommended that Calloway continue with the current medications he was taking until the next hearing concerning his involuntary medication occurred, which was scheduled for December 2011.  (Trinh Decl., Exhibit L at 2:19-22.)

81.    On November 16, 2011, Dr. Trinh signed the Declaration drafted by Dr. Bostanjian. After reviewing Dr. Bostanjian's chart notes and his own chart notes, it was Dr. Trinh's medical opinion that Calloway was doing relatively well on the Depakote and Risperidone medications, and that, unless ordered to do so, Calloway would not take these medications.  Therefore, a renewal of the order to involuntarily medicate Calloway was medically appropriate.  (Trinh Decl., Exhibit L at 2:23-3:3.)

82.    Prior to signing this Declaration, Dr. Trinh had no knowledge of any complaints submitted by Calloway concerning Dr. Trinh's treatment or care of Calloway, complaints submitted by Calloway concerning the quality of medical care provided to him, or complaints regarding prison over-crowding.  (Trinh Decl., Exhibit L at 2:8-11.)

83.    Dr. Syed, the Chief Psychiatrist at KVSP, met with Dr. Bostanjian at Calloway's cell to discuss Calloway's case on December 7, 2011, at which time Calloway appeared to be intrusive, demanding, argumentative, and irritable.  Calloway stated that he was not mentally ill, did not need to take psychotropic medication, and was not taking the medication prescribed.

84.    Dr. Syed reviewed Calloway's records, including a Declaration drafted by Dr. Bostanjian, and prepared a supplemental declaration, dated December 14, 2011, for consideration in an upcoming legal proceeding to determine whether Calloway should continue to be forced to take psychotropic medication, which reiterated the history reported to Dr. Syed of prior self-destructive behavior which included an incident of April 25, 2009, when Mr. Calloway stated, to a Dialysis Technician, D. Hawn, "If I don't win my appeal, I'm going to kill a C/O so they kill me.  I'm not

22

going to stay in prison for the rest of my life for something I did not do."  This history also included an

incident on May 14, 2009, when Mr. Calloway, while receiving kidney dialysis, had administered

approximately 700 cc of normal saline from a 1000 cc intravenous bag, hanging on a dialysis machine

pole, leaving the bag empty, which could have introduced air into his blood stream, killing him.

Additionally, this history referred to an incident on September 10, 2009, when Mr. Calloway was so

disruptive at the John D. Clarich Memorial Hospital, demanding when and how to be seen by medical

staff, that medical staff refused to examine or treat him.  This history also included an incident on

October 23, 2009, when, while receiving kidney dialysis, Mr. Calloway stated to a Hemo-Dialysis

Technician in the nineteen-bed dialysis facility operated by DaVita Dialysis Centers, "if shit was to

pop off in here, there is only four cops.  Your asses would get raped."  It also was reported to me that

Mr. Calloway went on to state, "The cops would kill one of you before they would let an inmate

escape."  (Syed Decl., Exhibit N, at 2:3-21.)

85.     This history reviewed by Dr. Syed also documented that, in 2010, after being ordered to

take psychotropic medications, Calloway accepted recommended medical treatment without incident.

(Syed Decl., Exhibit N, at 2:22-23.)

86.     Dr. Syed concurred with Dr. Bostanjian that, if psychotropic medications were not

administered, Calloway likely would revert to prior self-destructive behavior and would attempt to

thwart medical staff in their efforts to keep him alive through dialysis treatment.  In his professional

medical opinion, by either acting impulsively in a manner which prevented him from receiving

medical treatment, or by refusing dialysis, Calloway was gravely disabled, and that the administration

of involuntary medication was the most appropriate and least restrictive means of safeguarding

Calloway's health and safety.  (Syed Decl., Exhibit N, at 2:24-3-2.)

87.     Prior to December 14, 2011, Dr. Syed unaware of any complaints inmate Calloway had

asserted against himself, or against the health care professional at Kern Valley State Prison, and his

recommendations and opinions concerning Calloway were motivated solely by a desire to treat

Calloway's mental health issues, not to retaliate against Calloway for asserting any complaints.  (Syed

Decl., Exhibit N, at 3:7-11.)

23

88.     On June 28, 2011, Calloway filed a Petition for Writ of Habeas Corpus in Kern County Superior Court, alleging that Defendants Kelly, Wang, Talisman, and Schomer had prepared fabricated reports concerning Calloway's mental illness in order to retaliate against Calloway for submitting complaints concerning deliberate indifference to Calloway's serious medical needs by CDCR personnel and CDCR outside contractors.  (FAC, ECF NO. 10, at 19:1-15, 21:5-22:28, and 24:12-14.)

89.     Calloway's Petition for Writ of Habeas Corpus was denied by Kern County Superior Court Judge Felice on August 2, 2011, who specifically held that there was no basis for Calloway's claim of retaliation because of Calloway's propensity to engage in paranoid and self-destructive behavior when he is not the center of attention.  (Order, FAC, ECF No. 10, at 56-58.)

90.     Calloway filed a Petition for Writ of Habeas Corpus in the Fifth District Court of Appeal on September 9, 2011, alleging that Judge Felice had erred in denying the Petition for Habeas Corpus filed in Kern County Superior Court.  (FAC, Exhibit A, ECF No. 10, at 29-41.)

91.     The Fifth District Court of Appeal denied Calloway's Petition for Writ of Habeas Corpus.  (FAC, Exhibit A, ECF 10, at 59.)

92.     Calloway filed a Petition for Writ of Habeas Corpus in the California Supreme Court on November 10, 2011, contending that Judge Felice had erred in denying Calloway's Petition for Habeas Corpus filed in Kern County Superior Court.  (FAC, Exhibit A, ECF No. 10, at 42-54.)

93.     The California Supreme Court denied Calloway's Petition for Habeas Corpus.  (FAC, Exhibit A, ECF No. 10 at 60.)

94.     Prior to November 9, 2009, Calloway had been diagnosed with Mood Disorder, due to Kidney Disease, made on August 20, 2009, by J. Mahoney, Ph.D.  (Talisman Decl., Exhibit L, at 4:21-23.)

### D.     Retaliation

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  Also protected by the First Amendment is the right to pursue civil rights litigation in federal court without retaliation.  Silva v. Di Vittorio, 658 F.3d

1090, 1104 (9th Cir. 2011).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence.  Bruce v. Ylst, 351 F.3d 1283, 1288-1289 (9th Cir. 2003).  However, mere speculation that defendants acted out of retaliation is not sufficient.  Wood v. Yordy, 753 F.3d 899, 904-905 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew of plaintiff's prior lawsuit or that defendants' disparaging remarks were made in reference to prior lawsuit).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'"  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  Id. (quoting Sandin, 515 U.S. at 482).

**E.     Summary of Plaintiff's Motion for Summary Judgment**

In his motion for summary judgment, Plaintiff contends that on November 9, 2009, while incarcerated at SATF, his life was placed in imminent danger with regard to his hemodialysis treatment.  After Plaintiff filed numerous medical grievances and complaints, deliberate attacks of retaliation began.  After he filed the complaints, he was informed by custody staff Hernandez that he would place Plaintiff in the isolation room every time he went for dialysis treatment.  At the very next hemodialysis treatment, Plaintiff was placed in a Hepatitis isolation room subjecting him to Hepatitis B and C.

Plaintiff continued to be harassed by custody medical staff who fabricated false rules violation reports in order to build a case against Plaintiff to have him be subjected to involuntary medication because he was "loud" at dialysis treatment, not because he was refusing his life sustaining treatment.

On November 9, 2009, after being placed on a dialysis machine and falling asleep, Plaintiff was awakened by correctional officers Luna and Hernandez and singled out once again when they removed a blanket from his body.   Plaintiff contends that his blanket was confiscated from him because he reported to the State licensing department that medical staff was allowing custody officers Luna and Hernandez to cover the isolation windows with cardboard so that Plaintiff could not see out the window.

On November 9, 2009, after medical staff refused to discontinue the harassment and retaliation, Plaintiff requested to be taken off the hemodialysis machine.  On November 10, 2009, Plaintiff was taken to the clinic in relation to a medical complaint he filed as a group appeal.  After Plaintiff explained the situation, he was placed in a holding cell and then informed that he was being transported to the emergency room for a mental health evaluation.  This was done after Plaintiff exercised his right to refuse to talk to mental health staff.

Once Plaintiff arrived at the emergency room, he was placed in a medical room until he spoke with Dr. Kelley, and after Plaintiff explained his situation he was informed (for no reason) that he was being placed in a holding cage cell for admission into the crisis mental health bed.

Plaintiff refused to exit his cell and was threatened by staff that forced would be utilized to extract Plaintiff from his cell, to which Plaintiff responded that he would return the assault upon officers.  Plaintiff decided to surrender and after he was handcuffed and exited the cell, Dr. Talisman without warrant injected Plaintiff with psychotropic medication without consent.

Defendants deliberately conspired by fabricating state documents in order to obtain an illegal Keyhea order in retaliation for Plaintiff's complaints.

    1.    <u>Plaintiff's Request for Judicial Notice</u>

Plaintiff requests that the Court take judicial notice of the inmate grievances he has filed, attached as Exhibits A through M in support of his motion for summary judgment.  The Court can take judicial notice of the existence of the filing of an inmate grievance; however, the Court cannot take judicial notice of the truth of the facts and matters asserted therein.  Accordingly, the Court takes judicial notice of the mere fact that Plaintiff filed certain inmate grievances within the CDCR, to the

26

extent they are relevant to his motion for summary judgment, but the Court cannot and does not take

judicial notice as to the truth of the matters asserted therein.

### F.    Defendants' Opposition to Plaintiff's Motion for Summary Judgment

Defendants oppose Plaintiff's motion for summary judgment because it is based on the

existence of prior and subsequent complaints asserted by him, without any evidence that Plaintiff

experienced adverse action by the Defendants because of the complaints.  Further, Plaintiff's

complaints are too remote in time to support a claim of First Amendment retaliation.  Defendants

argue that Plaintiff fails to provide competent evidence that he did not require the involuntary

administration of psychotropic medication in order to continue with hemodialysis treatment he needed

to survive, and the reports attached to Plaintiff's moving papers demonstrate that he did, in fact,

require this medication because of a pattern of self-destructive behavior which was interfering with

hemodialysis treatment.  Thus, Plaintiff has failed to establish that the medication did not advance a

legitimate correctional goal to succeed on claim of retaliation in violation of the First Amendment.

Defendants further argue that Defendants Bostanjian, Trinh, and Syed did not personally participate in

the extension of an order allowing involuntary medication, and cannot be held liable under section

1983.  Plaintiff's claim in his Petition for Writ of Habeas Corpus that Defendants Kelley, Wang,

Talisman, and Schomer retaliated against him by administering psychotropic medication, Plaintiff's

claim against these Defendants is barred by res judicata and collateral estoppel.  Lastly, Defendants

are entitled to qualified immunity because they reasonably relief upon reports by third parties of

Plaintiff's self-destructive behavior.

####    1.    Request for Judicial Notice

In support of their opposition to Plaintiff's motion, Defendants request to take judicial notice

of the following facts:

a.    The Complaint in <u>Calloway v. Montgomery</u>, 1:05-cv-01284 (E.D. Cal.), was filed on

October 11, 2005.  (Complaint, Exhibit A.)

b.    The Complaint in <u>Calloway v. Veal</u>, 1:08-cv-01896 (E.D. Cal.), was filed on December

10, 2008.  (Complaint, Exhibit B.)

c.      The Complaint in <u>Calloway v. Veal</u>, 2:09-cv-02907 (E.D. Cal.), was filed on October 19, 2009.  (Complaint, Exhibit C.)

d.      The Complaint in <u>Calloway v. Veal</u>, 2:09-cv-02907 (E.D. Cal.), was dismissed without prejudice on September 3, 2010.  (Order, Exhibit D.)

e.      The First Amended Complaint in <u>Calloway v. Veal</u>, 2:09-cv-02907 (E.D. Cal.), was filed on December 14, 2010.  (First Amended Complaint, Exhibit E.)

f.      An Order Directing Service in <u>Calloway v. Veal</u>, 2:09-cv-02907 (E.D. Cal.), was issued on May 11, 2011.  (Order, Exhibit F.)

Under Rule 201, the Court may take judicial notice of an adjudicative fact that is not subject to reasonable dispute because it is either (1) generally known or "(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The filings attached to Defendants' request for judicial notice can be determined "from sources whose accuracy cannot reasonably be questioned."  <u>Id.</u>  Accordingly, the Defendants' request for judicial notice is GRANTED because the docket and filings in Plaintiff's other actions are matters subject to judicial notice.

### G.      Plaintiff's Reply to Defendants' Opposition

In reply, Plaintiff contends he has provided competent evidence that he did not require the involuntary forced medication because he was not due for life sustaining treatment medication until November 11, 2009.  It was falsified that Plaintiff refused dialysis and pulled out his catheter on November 9 and 10, 2009, in reprisal of Plaintiff's litigation and inmate complaints concerning the deliberate indifference to his serious medical needs.  Plaintiff contests the contention that he was self-destructive or gravely disabled and incompetent to carry out his daily living.

### H.      Findings on Plaintiff's Motion for Summary Judgment

Plaintiff bears the burden of proof at trial.  To prevail on his motion for summary judgment against Defendants, Plaintiff must affirmatively demonstrate that no reasonable trier of fact could other than for him.  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  If Plaintiff meets his initial burden, Defendants are required to set forth specific facts showing there is a genuine issue for trial.

Plaintiff's claim is premised on retaliatory conduct by way of involuntary medication taken in response to his filing lawsuits and/or inmate grievances.  Plaintiff has a protected First Amendment right to file a grievance and/or complaint.  Watison v. Carter, 669 F.3d at 1114.  However, Plaintiff must show that his filing of the grievance and/or complaint was the substantial motivation for Defendants' actions taken in relation to his involuntary medication.  Brodheim v. Cry, 584 F.3d at 1271 (citing Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff has provided no evidence to support his belief that Defendants' actions were in retaliation for his filing a grievance and/or complaint.  Rather, Plaintiff merely recites a litany of complaints he had asserted against correctional officers, health care personnel and CDCR hemodialysis contractors (Calloway Decl., ECF NO. 93 at 50:25-53:13, 55:13-62:27, Exhibits A-H, ECF No. 93 at 69-2000, ECF No. 93 at 1-61), who are not Defendants in this action.  Mere belief and speculation do not create a factual dispute for purposes of summary judgment.  Nelson v. Pima Community College, 83 F.3d 1075, 1081-1082 (9th Cir. 1996).

Plaintiff alleges in conclusory terms that each Defendant named in this action personally participated in the fabrication of state documents indicating that Plaintiff was gravely disabled as of November 10, 2009.  (Calloway Decl., ECF No. 93 at 54:9-17.)  However, Plaintiff does not demonstrate which Defendants prepared reports or how the reports were false.  Further, Plaintiff fails to present competent psychiatric or psychological evidence to support that he was not gravely disabled, from a psychiatric or psychological viewpoint, as of November 10, 2009.  To the contrary, the only mental health reports submitted by Plaintiff are reports authored by Defendant Bostanjian, and signed by Defendant Trinh (Motion, Exhibit L, ECF NO. 93-1 at 130-137), Defendant Schomer (Motion, Exhibit M, ECF No. 93-1 at 185-192), and a portion of the report apparently prepared by Dr. Syed on December 14, 2011 (Motion, Exhibit L, ECF No. 93-1 at 128-129), all of which support the finding that Plaintiff was gravely disabled and required involuntary medication in order to ensure that he continued with hemodialysis treatment.  Furthermore, the Petition for Involuntary Medication, attached to Plaintiff's motion, was granted and it was found that Plaintiff was gravely disabled and required involuntary medication, dated December 20, 2009.  (Motion, Exhibit M. ECF No. 93-1 at 204-206.)  Plaintiff's personal opinion that he was gravely disabled  or that the reports prepared by

psychological and psychiatric experts, is not competent evidence to support a finding of summary

judgment in his favor because Plaintiff is not a qualified expert witness medical diagnosis or

conditions.  Fed. R. Evid. 701; see also Fleming v. Lefevere, 423 F.Supp.2d 1064, 1070 (C.D. Cal.

2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of

fact because he has not shown that he has any medical training or expertise upon which to base such

an opinion.")

The reports outlined above outline a long-standing history of self-destructive behavior by

Plaintiff which interfered with his hemodialysis treatment.  Indeed, Plaintiff admits that, prior to

November 9, 2009, he had a complete mental breakdown and attempted to end his life at a Mental

Health Crisis Bed.  (Calloway Decl., ECF No. 93 at 52:8-12.)  The evidence submitted by Plaintiff

does not establish, and in fact contradicts his claim that he was administered involuntary medication

merely because he missed 3 ½ hours of hemodialysis treatment on November 9, 2009.

Plaintiff's further argues that he was never diagnosed with a mood disorder prior to November

10, 2009, and presumably could not provide a basis for Defendants to reach the finding on November

10, 2009, that the involuntary administration of psychotropic medication was necessary.  Contrary to

Plaintiff's claim, the medical records attached to his motion indicate that he was diagnosed with a

mood disorder due to kidney disease on August 20, 2009**.**  (Motion, Exhibit M, ECF No. 87-4 at

33:21-23, 85.)

Although Plaintiff claims that it was reported falsely that he refused hemodialysis on

November 10, 2009, Plaintiff admits that he terminated hemodialysis treatment on November 9, 2009,

prematurely, exercising his rights as a patient.  (Motion, ECF No. 93 at 17:4-10; 19:19-28.)  However,

Plaintiff fails to demonstrate that there was no basis for proceeding to administer medication

involuntarily to ensure that Plaintiff would continue to receive hemodialysis treatment, and Plaintiff

has failed to demonstrate that the undisputed facts support a finding that he is entitled to judgment as a

matter of law.

After Plaintiff was administered medication involuntarily in November 2009, the reports

attached to his motion, indicate that Plaintiff's mental condition stabilized in 2010 which allowed him

to accept hemodialysis treatment.  (Motion, Exhibit L, ECF No. 93-1 at 128, 133:6-12, Exhibit M,

ECF No. 93-1 at 191:4-11.)  Plaintiff was interviewed on October 25, 2010, and October 18, 2011, and Plaintiff denied any mental illness, denied the need for any medication to treat his mental illness, and believed that nothing would happen to him if he stopped taking his medication to treat his mental illness.  Plaintiff's denial relating to his mental illness and necessity to take medication to treat such illness, lead to a reasonable belief that if Plaintiff did not take psychotropic medication, his prior pattern of self-destructive behavior would occur and interfere with his hemodialysis treatment. (Motion, Exhibit L, ECF No 93-1 at 138, 129, 133, Exhibit M, ECF No. 93-1 at 191.)  Thus, there is a lack of evidence, and indeed, the evidence presented demonstrates the involuntary administration of medication advanced a valid penological interest in providing inmates with the necessary medical treatment for the safety of the inmate.  See Washington v. Harper, 494 U.S. 210, 225 (1990).

Furthermore, Plaintiff has not shown that the undisputed facts support his claim of retaliation based on the prior complaints filed against correctional and medical staff.  Plaintiff's claim of retaliation is based on a number of prior complaints asserted against third-party correctional officers, health care personnel and CDCR hemodialysis contractors between November 3, 2008, and August 16, 2009.  (Motion, Exhibits A-H, ECF No. 93 at 69-200, ECF No. 93-1 at 1-61.)  The most recent complaint references events that took place on August 12, 2009, involving correctional officer Luna and registered nurse Gine-almost three months before the events on November 9, 2009, which are the subject of the instant action.  In addition, Plaintiff cites to several lawsuits (of which the Court takes judicial notice) filed by him prior to November 2009.  The case of Calloway v. Montgomery, No. 1:05-cv-01284 LJO BAM (E.D. Cal.) was filed on October 11, 2005.  The case of Calloway v. Veal, No. 1:08-cv-01896 LJO GSA (E.D. Cal.), was filed on December 10, 2008.  Plaintiff filed Calloway v. Veal, No. 2:09-cv-02907 GEB EFB (E.D. Cal.) was filed on October 19, 2009, and after dismissal of the complaint with leave to amend, the operative first amended complaint was filed on December 14, 2010.

Furthermore, Plaintiff submitted complaints after August 16, 2009, but after the events on November 9, 2009.  For instance, Plaintiff filed inmate grievance, log number SATF-33-10-11010 (Motion, Exhibit I, ECF No. 93-1 at 62-71), is self-dated by Plaintiff on November 8, 2009, the declaration of facts in support of the grievance is dated November 17, 2009, and the bases of the

31

complaint involves the conduct which took place on November 9, 2009.  Thus, the Court presumes the grievance was not filed on November 8, 2009, because the basis of the complaint involves conduct which took place one day later on November 9, 2009.  In addition, Plaintiff cites the following  inmate grievances which are all dated after the events in November 2009: (1) inmate appeal log number COR-09-10956, dated January 12, 2010 (Motion, Exhibit J, ECF No. 93-1 at 72-81), inmate appeal, log number COR-09-10-12365, dated February 4, 2010 (Motion, Exhibit K, ECF No. 93-1 at 84-96), inmate appeal, log number COR-09-10-10842, dated November 18, 2009 (Motion, Exhibit K, ECF No. 93-1 at 97-103), inmate appeal, log number COR-09-10-11365, dated December 29, 2009 (Motion, Exhibit K, ECF No. 93-1 at 104-107), and inmate appeal, log number COR-09-10-12171, dated February 24, 2010 (Motion, Exhibit L, ECF No. 931 at 109-115.)

Plaintiff does not offer sufficient admissible evidence to establish that any Defendant knew of any of the filings, acted against Plaintiff on that basis, and had no other reason for administering involuntary medication.  Thus, Plaintiff has not proved the required "causal connection" between the complaints and/or lawsuits and the Defendants' actions.  <u>Hartman v. Moore</u>, 547 U.S. 250, 260 (2006).

Based on the foregoing, Plaintiff has failed to meet his burden of demonstrating that he is entitled to judgment as a matter of law, and his motion for summary judgment should be denied.

## I.       Defendants' Motion for Summary Judgment

Defendants move for summary judgment because they did not retaliate against Plaintiff, and they were unaware of Plaintiff's complaints.  Dr. Talisman determined on November 10, 2009, that Plaintiff required involuntary medication in order to successfully complete dialysis treatment.  And, Dr. Talisman did not take adverse action against Plaintiff because of Plaintiff's complaints as he learned of the grievances filed by Plaintiff against dialysis staff members on November 12, 2009-after Plaintiff became calmer after the administration of Haldol.  Defendants further argue that they did not fabricate evidence or reports in order to have Plaintiff involuntarily medicated.  Defendants Bostanjian, Trinh, and Syed did not personally participate in extending the Keyhea order against Plaintiff.  Plaintiff's retaliation claim against Defendant Kelley, Wang, Talisman, and Schomer are barred by res judicata and/or collateral estoppel.  Lastly, in the alternative, Defendants are entitled to qualified immunity.

### J.      Plaintiff's Opposition to Defendants' Motion

Plaintiff contends Defendants have failed to meet their burden of proof demonstrating that Plaintiff was gravely disabled and incompetent or a danger to himself at the time of the administration of involuntary medication.  The administration of involuntary medication was done out of retaliation after Plaintiff complained of the continued harassment at the hemodialysis clinic.  On November 9, 2009, Plaintiff's nephrologist doctor never recommended that he be evaluated by mental health.  The only yelling by Plaintiff that took place on November 9, 2009, was because Plaintiff had inmates sign inmate complaints about the inadequate health care.  Because of Plaintiff's complaints, he was referred to mental health and administered involuntary medication on November 10, 2009.

On November 10, 2009, Plaintiff was taken to the yard clinic for a medical group inmate appeal hearing.  After the hearing, Plaintiff was deliberately and maliciously not taken back to his cell.  Instead, Plaintiff was informed that he had to go to the emergency room for a mental health evaluation.  Plaintiff refused to go to the emergency room to speak with mental health, but he was physically forced by custody against his well without a legitimate correctional purpose.  There is no evidence in the chronic care follow-up visit or physician's progress notes to suggest that Plaintiff was gravely disabled and incompetent to refuse treatment or that his life was in imminent danger because he was not scheduled for dialysis treatment until November 11, 2009.  Plaintiff was not offered dialysis treatment on November 10, 2009, to refuse.  (Opp'n, Exhibit 11, ECF 102.)

Plaintiff informed Dr. G. Kelley during his mental health evaluation on November 10, 2009, that he had no history of drug use and due to the side effects he did not take psychotropic drugs.  Plaintiff also informed Dr. Kelley that he did not suffer any mood swings or bipolar disorders.  Plaintiff believed he was being retaliated against due to his litigation against custody and medical staff because of his complaints relating to the dialysis treatment.  After Plaintiff was placed in a holding cage, Dr. Kelley informed him that he was being admitted to the crisis unit because he refused hemodialysis and pulled out his catheter.  When Plaintiff attempted to explain that he could not have done such actions because his last hemodialysis was on November 9, 2009, Plaintiff was threatened with extraction by physical force.  Dr. Kelley was fully aware that Plaintiff was not gravely disabled, incompetent or a danger to himself.  (Opp'n, Exhibit 12, ECF No. 102.)

33

1    Prior to admission to the crisis unit, Dr. Wang was the Primary Chief Medical Officer and saw

2    Plaintiff on November 9, 2009, and knew Plaintiff did not have dialysis or pull his catheter out.  Dr.

3    Wang fabricated his report because he knew that Plaintiff was never sent out for hemodialysis on

4    November 10, 2009.  (Opp'n, Exhibit 13, ECF No. 102.)   Plaintiff was placed on suicide watch out of

5    retaliation for filing complaints and diagnosed falsely as "paranoid" due to his hemodialysis.

6        **K.        Defendants' Reply to Plaintiff's Opposition**

7        In reply, Defendants submit that Plaintiff opposes their motion by making conclusory

8    arguments, consisting of his own lay opinion, without competent expert testimony to support such

9    contention.  Plaintiff contends that he was the subject of retaliation because he had asserted complaints

10   in the past; however, Plaintiff does not demonstrate that he experienced adverse action because of the

11   prior complaints.  Plaintiff's claim that he did not engage in any prior self-destructive behavior fails to

12   raise a genuine issue of material fact because the Defendants reasonably relied on documentation

13   prepared by third parties concerning Plaintiff's conduct.

14       Defendants submit that Plaintiff argues outside the pleadings by claiming that Defendants

15   failed to follow CDCR procedures concerning involuntary medication, mis-states the evidence

16   concerning Defendant Fritz, and incorrectly asserts that Defendants have waived the defense of res

17   judicata and/or adverse possession.  Lastly, Defendants assert that to the extent the third party

18   documentation presented to Defendants were inaccurate, Defendants are still entitled to qualified

19   immunity.

20       **L.        Findings on Defendants' Motion for Summary Judgment**

21           1.      Plaintiff's Mental Health Condition

22       Defendants argue and submit evidence by way of the medical opinion of three separate medical

23   professionals that the administration of psychotropic medication to Plaintiff on November 10, 2009,

24   served a legitimate penological interest by preventing his self-destructive behavior to prevent the

25   interruption of his dialysis treatment.   (Wang Decl., Exhibit F; Kelly Decl., Exhibit G; Progress Note,

26   Exhibit H; Talisman Decl., Exhibit M.)  In opposition, Plaintiff merely submits his own conclusory

27   declaration to claim that he was not gravely disabled, incompetent to consent, or an imminent danger

28   to himself.  However, because Plaintiff is not a psychologist or a psychiatrist Plaintiff's personal

34

1   opinion is insufficient to defeat summary judgment based on the medical evidence presented by

2   Defendants.  See Fleming v. Lefevere, 423 F.Supp.2d at 1070 ("Plaintiff's own opinion as to the

3   appropriate course of care does not create a triable issue of fact because he has not shown that he has

4   any medical training or expertise upon which to base such an opinion.")

5          In fact, many of the exhibits submitted in opposition support Defendants' position that, as of

6   November 9, 2009, Plaintiff was gravely disabled and involuntary administration of medication was

7   necessary.  Attached to Plaintiff's opposition is the report of Dr. Kelley, dated November 10, 2009

8   (Exhibit 12, ECF No. 102 at 85), the report of Dr. Wang, dated November 10, 2009 (Exhibit 13, ECF

9   No. 102 at 89), the medical notes of Dr. Flavin and Dr. Talisman (Exhibit 14, ECF No. 102 at 92),

10  the report of Dr. Talisman, dated November 24, 2009 (Exhibit 15, ECF No. 102 at 100), the notes of Dr.

11  Flavin, Dr. Talisman, and Dr. Kelley authored in November 2009 (Exhibit 17, ECF No. 102 at 112-

12  128).   Dr. Kelley's report indicates that Plaintiff had refused to undergo dialysis, was paranoid, and

13  was suffering from a mood disorder (Exhibit 12, ECF No. 102 at 86-88), and Dr. Flavin's notes

14  demonstrate that Plaintiff was being admitted to a mental health crisis bed because he was refusing

15  dialysis.  (Exhibit 13, ECF No. 102 at 99).  Dr. Wang also noted in his report that Plaintiff was

16  paranoid and refusing dialysis.  (Exhibit 13, ECF No. 102 at 90.)  Dr. Talisman's report, dated

17  November 24, 2009, reported that Plaintiff was a danger to himself because of his escalating hostility,

18  paranoia, impulsive and self-destructive behavior, which was interfering with his dialysis treatment,

19  and Plaintiff was gravely disabled.[3]  (Exhibit 15, ECF No. 102 at 102-103.)

20         Furthermore, the evidence submitted by Plaintiff indicates that he was in need of psychotropic

21  medication after November 9, 2009.  Dr. Mazur testified during a hearing on December 2010, that

22  Plaintiff suffered a mood disorder, was gravely disabled and was a danger to himself.  (Exhibit 20,

---

[3] Indeed, Dr. Talisman's report elaborates on the danger posed to Plaintiff by the lack of dialysis treatment by stating:
"On the day of admission because of his severely impulsive and self-destructive behavior, his dialysis, which needs three
times a week to survive, had to be prematurely terminated.  As he had already been banned from the only other locally
available dialysis unit in this part of the valley, further dialysis that day would have required immediate transport to a
hospital 70 miles away in Bakersfield.  This could not be arranged on such short notice.  As a result inmate's bodily waste
accumulated to a high level in his blood stream put his own life at risk.  Dialysis at a local unit had to be arranged for the
following day.  This poses an imminent danger to the inmate because the accumulation of bodily waste in the blood stream
pre-disposes him to spontaneously form blood clots, suffer internal bleeding in organs and makes him prone to have
cardiac arrhythmias which can result in death.  In the long run, it also makes it more difficult for this inmate to be
maintained eligible to receive a kidney transplant."  (Exhibit 15, ECF No. 102 at 102.)

ECF No. 102 at 141:15-142:9.)  Dr. Mazur further testified that Plaintiff's condition had improved after the involuntary administration of medication.  (Id. at 142:22-143:2.)  In addition, the declaration dictated by Dr. Bostanjian, and signed by Dr. Trinh, dated December 14, 2011, and submitted in support of the Verified Petition for Renewal Judicial Determination re: Involuntary Medication (Exhibit 29, ECF No. 102 at 273-277), demonstrates that Plaintiff was still suffering from a mood disorder, and, without involuntary medication, would decompensate and engage in self-destructive behavior.  Dr. Syed reached a similar conclusion to that of Dr. Bostanjian.  (Exhibit 30, ECF No. 102 at 286-287.)  On December 14, 2011, Dr. Bostanjian testified that Plaintiff was still gravely disabled because he was bipolar, had mood swings, and was not cooperative in his treatment.  (Exhibit 31, ECF No. 102 at 295:5-296:11.)

The fact that Plaintiff cites to several prior mental health reports to support his claim that he was not in need of involuntary medication in November 2009, does not support his claim as they are too remote in time and are not relevant to Plaintiff's mental health condition in 2009.  In addition, Plaintiff's claim that a single instance of the refusal to complete hemodialysis cannot support an order for involuntary medication does not create a trial issue of material fact.  There is simply no evidence or legal authority to support Plaintiff' position, and all of the competent and admissible evidence outlined herein support the finding that Plaintiff was incompetent to refuse medication and was gravely disabled to the point that involuntary medication was warranted.

Plaintiff's claim that Dr. Fritz retaliated again him by recommending that psychotropic medication be administered in any email, is unfounded.  (Statement of Facts, ECF No. 101 at 13:12-20.)  The e-mails from Fritz, dated November 9, 2009, demonstrate that Fritz did not mention, nor recommend, involuntary medication for Plaintiff.  (Exhibit 10, ECF No. 102, at 79.)  Rather, Fritz merely noted the difficulties experienced in providing dialysis to Plaintiff on November 9, 2009.  The only reference to involuntary medication in the e-mail was made by a third party, Patricia Vryhof.  (Exhibit 10, ECF No. 102 at 78-79.)  Accordingly, there is no evidence to support Plaintiff's claim that Defendant Fritz recommended involuntary medication.

There is also no evidence to support Plaintiff's claim that Defendants falsified evidence or reports.  The medical recommendations to administer involuntary medication to Plaintiff to

successfully continue with his dialysis treatment, were based in large extent on prior reports concerning Plaintiff's incidents of impulsive and self-destructive behavior, as documented by third parties.  On April 25, 2009, it was noted by Dialysis Technician, D. Hawn, that Plaintiff stated "If I don't win my appeal, I'm going to kill a C/O so they kill me.  I'm not going to stay in prison for the rest of my life for something I did not do."  (Rules Violation Report, Log No. 4AR-09-05-06, Exhibit A, ECF No. 87-3.)  On May 14, 2009, while receiving dialysis, correctional staff documented that Plaintiff had administered approximately 700 cc of normal saline from a 1000 cc intravenous bag, hanging on a dialysis machine pole, leaving the bag empty.  (Rules Violation Report, Log. No. 4A4-09-05-27, Exhibit B, ECF No. 87-3.)  On July 18, 2009, a Patient Care Technican from DaVita Renal Services, L. Koetzner, reported that, while receiving kidney dialysis treatment at SATF, Plaintiff had removed a venous needle from his body and proceeded to spray blood around the room.  (FAC, ECF No. 10-1, at 91.)  On September 10, 2009, correctional sergeant J. Davidson reported that Plaintiff was so disruptive at the John D. Clarich Memorial Hospital, demanding when and how to be seen by medical staff, that medical staff refused to examine or treat him.  (Rules Violation Report, Log. No. HCO-09-09-03, Exhibit D, ECF No. 87-3.)  On October 23, 2009, a Davita Dialysis Hemodialysis Technician documented that Plaintiff stated, "if shit was to pop off in here, there is only four cops. Your asses would get raped," and "the cops would kill one of you before they would let an inmate escape."  (Rules Violation Report, Log No. 4A2-09-10-93, Exhibit E, ECF No. 87-3.)  On November 2, 2009, Yasreen Bari, the Administrator of the nineteen-bed dialysis station operated by DaVita Dialysis Centers, wrote a memorandum stating that, due to Plaintiff's threats of violence, and foul and vulgar language, he should be removed from the nineteen-bed dialysis station, because the staff did not feel safe in treating Plaintiff.  (FAC, ECF No. 10-1, at 92.)  Although Defendants relied on these reports in recommending the administration of psychotropic medication for Plaintiff, Defendants did not author any of these reports, and therefore did not and could not have fabricated them.

Plaintiff acknowledges that he discontinued his dialysis treatment prematurely on November 9, 2009, and signed an Against Medical Advice Form (FAC, ECF No. 10, at 4.), but contends that he did not receive hemodialysis treatment on the following day, November 10, 2009, and therefore the reference to discontinuing dialysis treatment on November 10, 2009, is incorrect and false.  The

reference to discontinuing dialysis treatment on November 10, 2009, is contained in Dr. Wang's

Admission Report, dated November 10, 2009.  (FAC, ECF No. 10-1, at 109.)  By way of declaration,

Dr. Wang explained during the examination of Plaintiff on November 10, 2009, Dr. Wang was unable

to obtain a medical history from Plaintiff, due to his agitated mental state, and Plaintiff's UHR was not

available. (Wang Decl., Exhibit F, at 2:21-23, ECF No. 87-3.)  Dr. Wang reasonably relied on the

information provided to him by mental health staff that Plaintiff had interrupted his dialysis, had

pulled out a catheter, and smeared his blood towards nursing and custody staff.  (Wang Decl., Exhibit

F, at 2:21-24, ECF No. 87-3.)  Whether Plaintiff had terminated dialysis on November 9, 2009, or

November 10, 2009, was not significant to Dr. Wang's diagnosis that Plaintiff was suffering from

paranoid ideation, threatening behavior, agitation, and end-stage renal disease.  (Wang Decl., Exhibit

F at 2:25-3:3, ECF No. 87-3.)  The date on which Plaintiff terminated dialysis, i.e. November 9, 2009

versus November 10, 2009, as reported by Dr. Wang cannot and does not create a genuine issue of

material fact, as Dr. Wang's report was based  on Plaintiff's mental health evaluation as provided to

him by mental health staff, as well as information provided by Plaintiff.  Accordingly, there is no basis

to Plaintiff's claim that Dr. Wang falsified his report.

Furthermore, Defendants Dr. Bostanjian, Dr. Trinh, and R. Syed were not involved in

evaluating whether Plaintiff should continue to receive psychotropic medication involuntarily under

the Keyhea Order which was scheduled to expire on December 14, 2011.  (FAC, Exhibit A, ECF No.

10-1, at 136; Bostanjian Decl., Exhibit K, at 1:25-27, 3:25-28, ECF No. 87-4; Trinh Decl., Exhibit L at

2:23-3:3, ECF No. 87-4.)  The initial hearing was scheduled to occur on December 14, 2011; however,

the hearing was continued, first to January 31, 2012, and then to February 7, 2012.  (FAC, Exhibit A,

ECF No. 10-1, at 150, 162.)  At the hearing on February 7, 2012, attended by Dr. Bostanjian and Dr.

Syed, the order for involuntary medication was terminated.  (Bostanjian Decl., Exhibit K at 3:25-28;

Syed Decl., Exhibit N, at 3:3-6.)  Accordingly, because Defendants Bostanjian, Trinh, and Syed did

not cause the Keyhea Order to be extended, there is no basis for liability under section 1983, on this

claim.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

///

///

1
2.     <u>Prior Complaints</u>

2     Defendants Dr. Wang and Dr. Kelley declare that they were unaware of complaints submitted

3 by Plaintiff, and did not take adverse action against Plaintiff because of his prior complaints.  Their

4 assessments of Plaintiff were based on their professional judgment and not a desire to retaliate against

5 Plaintiff.  (Wang Decl., Exhibit F at 3:9-11; Kelley Decl., Exhibit G at 3:3-5.)  Defendants Dr.

6 Schomer, Dr. Mazur, Dr. Bostanjian, Dr. Trinh, and Dr. Syed declare that they were likewise unaware

7 of any complaints submitted by Plaintiff (Schomer Decl., Exhibit I at 3:25-27; Mazur Decl., Exhibit J

8 at 2:12-14; Bostanjian Decl., Exhibit K at 4:7-11; Trinh Decl., Exhibit L at 2:8-11; Syed Decl., Exhibit

9 N at 3:7-11), and any adverse action taken by them did not occur because of Plaintiff's prior

10 complaints.

11     Dr. Talisman determined on November 10, 2009, that Plaintiff required involuntary medication

12 in order to successfully complete dialysis treatment.  Dr. Talisman declares that he did not learn of the

13 grievances filed by Plaintiff against dialysis staff members until November 12, 2009, after Plaintiff

14 became calmer from the administration of Haldol.  (Talisman Decl., Exhibit M, ECF No. 87-4.)

15 However, even after Plaintiff informed Dr. Talisman that Plaintiff was going to sue him, Dr. Talisman

16 continued to recommend the administration of psychotropic medication, so that Plaintiff could

17 continue to successfully complete dialysis treatment.  (<u>Id.</u>)

18     Although Plaintiff refers to several prior complaints that he asserted against staff at SATF, he

19 fails to demonstrate that he was subjected to involuntary medication because of such complaints.  The

20 mere existence of prior complaints against prison staff does not prove that Plaintiff was the subject of

21 adverse action because of such prior complaints.  Retaliation is not established simply by showing

22 adverse activity by defendant after protected speech; rather, plaintiff must show a nexus between the

23 two.  <u>See</u> <u>Wood v. Yordy</u>, 753 F.3d 899, 905 (9th Cir. 2014); <u>Huskey v. City of San Jose</u>, 204 F.3d

24 893, 899 (9th Cir. 2000) (summary judgment proper against plaintiff who could only speculate that

25 adverse employment decision was due to his negative comments about his supervisor six or seven

26 month earlier; retaliation claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, i.e.,

27 "after this, therefore because of this."); <u>Dietrich v. John Ascuaga's Nugget</u>, 548 F.3d 892, 901 (9th

28 Cir. 2008) (finding no retaliation where plaintiff presented no evidence that defendants gave her a

traffic citation after reading a newspaper article about her First Amendment activities, rather than because she drove past a police barricade with a "road closed" sign on it).

Read in the light most favorable to Plaintiff, his declaration (the only evidence related to his retaliation claim) establishes only that Plaintiff made prior complaints regarding medical treatment and other things and Plaintiff was subsequently administered involuntary medication on November 10, 2009.  Plaintiff offers no admissible evidence to establish that any Defendant actually knew about the filing of his complaints and/or grievances against prison staff, acted against Plaintiff on that basis, and had no other reason for recommending the administration of involuntary medication.  Plaintiff has not proven the required "causal connection" between his prior complaints and any of the Defendants' actions.

By contrast, Defendants Dr. Wang, Dr. Kelley, Dr. Schomer, Dr. Mazur, Dr. Bostanjian, Dr. Trinh, and Dr. Syed all declare that they were unaware of Plaintiff's complaints and did not engage in adverse action as a result of such complaints.  (Wang Decl., Exhibit F at 3:9-11; Kelley Decl., Exhibit G at 3:3-5; Schomer Decl., Exhibit I at 3:25-27; Mazur Decl., Exhibit J at 2:12-14; Bostanjian Decl., Exhibit K at 4:7-11; Trinh Decl., Exhibit L at 2:8-11; Syed Decl., Exhibit N at 3:7-11.)  As to Dr. Talisman, even after Plaintiff informed him that Plaintiff was going to sue him, Dr. Talisman continued to recommend the administration of psychotropic medication.  Because Dr. Talisman believed that Plaintiff required psychotropic medication both before and after learning of Plaintiff's grievances against him and dialysis staff, Plaintiff has not demonstrated that Dr. Talisman's recommendations were the "but for" reason for his recommendation.  More importantly, Defendants have established a legitimate and penological reason for the administration of involuntary medication which formed the actual reasons for Defendants' actions.  As a result, Plaintiff has failed to establish that any Defendant would not have acted but for Plaintiff's prior complaints against prison staff.  Plaintiff's sheer speculation that Defendants' actions were based on his prior complaints is not sufficient for a reasonable jury to find retaliation.  Pratt, 65 F.3d at 808.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of retaliation.

40

1    For the foregoing reasons, there is a lack of sufficient evidence to raise a triable issue of fact

2  regarding the existence of a retaliatory motive on the part of any Defendant, and Defendants are

3  entitled to summary judgment.

4    3.    Res Judicata and/or Collateral Estoppel

5    Defendants Kelley, Wang, Talisman, and Schomer further argue the claims against them are

6  barred by res judicata and/or collateral estoppel.

7    Plaintiff argues that Defendants waived the affirmative defense of res judicata and/or collateral

8  estoppel.

9    The doctrine of res judicata protects "litigants from the burden of relitigating an identical

10  issue" and promotes "judicial economy by preventing needless litigation." Parklane Hosiery Co. v.

11  Shore, 439 U.S. 322, 326 (1979).  It "bars litigation in a subsequent action of any claims that were

12  raised or could have been raised in the prior action." Owens v. Kaiser Found Health Plan, Inc., 244

13  F.3d 708, 713 (9th Cir. 2001).  Stated differently, "[c]laim preclusion, often referred to as res judicata,

14  bars any subsequent suit on claims that were raised or could have been raised in a prior action." Cell

15  Therapeutics Inc. v. Lash Group, Inc., 586 F.3d 1204, 1212 (9th Cir. 2009); accord Tahoe-Sierra

16  Preservation Council, Inc. v. Tahoe Reg. Planning Agency, 322 F.3d 1064, 1078 (9th Cir. 2003)

17  ("Newly articulated claims based on the same nucleus of facts may still be subject to a res judicata

18  finding if the claims could have been brought in the earlier action.").  The court applies the doctrine

19  where there is: (1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity

20  between parties. Id.  These three elements constitute a successful res judicata defense. Id. at 1077.

21    A reasoned denial of a California habeas petition can have a claim-preclusive effect. Gonzales

22  v. California Dep't of Corr., 739 F.3d 1226, 1231 (9th Cir. 2014).  Federal courts are required to give

23  state court judgments the preclusive effects they would be given by another court of the state.

24  Brodheim v. Cry, 584 F.3d 1262, 1268 (9th Cir. 2009).  A state habeas judgment may have a

25  preclusive effect on a later action filed under 42 U.S.C. § 1983 in federal court. Gonzales v.

26  California Dep't of Corr., 739 F.3d at 1230-1231; Hawkins v. Risley, 984 F.2d 321, 323 (9th Cir.

27  1993).

28

In this case, Plaintiff filed a petition for writ of habeas corpus in the Kern County Superior Court claiming that Defendants Kelley, Wang, Talisman, and Schomer prepared fabricated reports regarding Plaintiff's mental illness in order to retaliate against Plaintiff (FAC, ECF No. 10, at 15-28) , and the claim was rejected on the merits in a reasoned opinion finding no basis to support such a claim.  (FAC, ECF No. 10-1 at 12-15.)  More specifically, the Superior Court stated, in relevant part:

> [Plaintiff] complains about the involuntary administration of psychotropic drugs which he characterizes as retaliatory by California State Prison, Corcoran California for complaining about his dialysis treatment.  He contends that the medication is designed to oppress him by keeping him in a docile state.
>
> The prison psychiatrists' disagree contending that [Plaintiff] has a mood disorder and because he sabotages his dialysis treatment becomes a danger to himself.  The incident occurred on December 9, 2009 [sic][4] wherein he refused dialysis treatment against medical advice.  [Plaintiff] became agitated which escalated when transported to the hospital in the mental health unit.
>
> The progress notes indicate that [Plaintiff] threatened to fight hospital staff trying to force him to take medication.  The declaration by Dr. Talisman opined that [Plaintiff] evidenced a pattern of becoming very agitated when he wasn't the center of attention and railed against his medical treatment while at the same time engaging in impulsive and self-destructive behavior.
>
> On May 14, 2009, [Plaintiff] tampered with the fluid bag pumping 700cc of fluid into his system when his kidneys could not evacuate it.  The nurse monitors the fluid level to ensure balance.  Such rapid intake of fluid could result in heart failure.
>
> On July 18, 2009, he intentionally dislodged the catheter spraying blood in the vicinity.  His paranoia escalated to making threats against dialysis staff causing him to be banned from two dialysis centers. Driving [Plaintiff] seventy miles to Bakersfield was out of the question giving the urgency of dialysis treatment and [Plaintiff's] irrational state.
>
> . . .
>
> On December 15, 2010, the administrative law judge approved the continued administration of psychotropic medication.  For such a renewal, all the prison need prove is that [Plaintiff] remains irrational and is a danger to himself.  The renewal petition opined that [Plaintiff] still has no insight into the refusal of dialysis treatment and the impact his agitated conduct has on staff.  . . .

---

[4] The state court's reference to December 9, 2009, and not November 9, 2009, appears to be a typographical error as the petition clearly references the date as November 9, 2009, not December.

. . . There is no basis for [Plaintiff's] claim of retaliation given [Plaintiff's] propensity to engage in paranoid and self-destructive behavior when he is not the center of attention.

(FAC, ECF No. 10-1, at 13-15.)

Because Plaintiff litigated the same factual issue of retaliation against Defendants Kelley, Wang, Talisman, and Schomer, and a final judgment was entered denying the claim on the merits, Plaintiff is barred by principles of res judicata from re-litigating the issue in the present action. Plaintiff's claim that Defendants waived the defense is without merit. Defendants initially asserted this affirmative defense in their responsive pleading pursuant to Rule 8(c)(1) of the Federal Rules of Civil Procedure. (ECF Nos. 34, 39, 49, 61.) A defendant is not required to assert the defense of res judicata in a motion for summary judgment. See City of Merced Redevelopment Agency v. Exxon Mobil, No. 1:08-cv-00714 LJO-GSA, 2015 WL 471672, *14 (E.D. Cal.) (citing Owens v. Kaiser Foundation Health Plan, Inc., 244 F.3d 708, 713 (9th Cir. 2001). Consequently, Plaintiff's retaliation claim against Defendants Kelley, Wang, Talisman, and Schomer is also barred from review.

## IV.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Plaintiff's motion for summary judgment be DENIED; and

2.      Defendants' motion for summary judgment be GRANTED in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections

//

//

//

//

//

//

with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 6, 2015**

UNITED STATES MAGISTRATE JUDGE

44